UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA PERRY,

                    Plaintiff,

        – against –

FLOSS BAR, INC., EVA SADEJ, STUART
ALLAN, and DOES 1 through 50,
inclusive,

                    Defendants.

**OPINION & ORDER**

21 Civ. 685 (ER)

R̲AMOS̲, D.J.:

        In April 2019, Joshua Perry was hired by Floss Bar, Inc., a company providing mobile

dental services, as part of a merger between Floss Bar and Perry's companies.  He now brings

suit against Floss Bar, alleging a series of violations of California law, including a violation of

California Corporate Securities Law, Cal. Corp. Code § 25000, *et seq.*, unlawful discharge for

opposing unlawful conduct in violation of Cal. Lab. Code § 1102, and violations of California's

Fair Housing and Employment Act, Cal. Gov't. Code §12900, *et seq.*  Perry also alleges common

law promissory fraud, intentional interference with contract and business relations, and

defamation.  Before the Court is Perry's motion for a preliminary injunction to prevent Floss Bar

from enforcing his Non-Competition and Non-Solicitation Agreement (the "Agreement").  For

the reasons discussed below, Perry's motion is DENIED.

## I.        BACKGROUND

        The parties agree on very little in this case.  Where necessary, the Court notes sources of

disagreement in its recitation of the facts.

### A.   The April 2019 Merger and Perry's Hire

Floss Bar is a company doing business in the "mobile dental care" field.[1]  It is incorporated in Delaware with its headquarters in New York.  Doc. 1, Notice of Removal, at 4. Sometime around September 2018, Floss Bar's CEO, Eva Sadej, and Perry, an entrepreneur with extensive experience in mobile dental care, engaged in a series of communications about Perry joining Floss Bar.  Doc. 1-1, Compl. ¶¶ 2–3, 15.   Perry was hired as President of Floss Bar on April 22, 2019, after several months of negotiations.  *See* Doc. 39-8, Heads of Terms re Employment Agreement.  Perry states that, to persuade him to join Floss Bar, Sadej made him a verbal promise that he would receive stock options for a 3% equity interest in Floss Bar.  Compl. ¶ 18.

The same day, Perry's company, Xsite Health Limited, sold its subsidiary, Onsite Service USA Holding, Inc. ("Onsite"), to Floss Bar.  Doc. 39-2, Second Sadej Decl., at ¶ 3.[2]  While Onsite was a subsidiary of Xsite Health Limited, it was also the parent company to the similarly-named Xsite Health, LLC.  After acquiring Onsite, Floss Bar then became the 100 percent owner of Xsite Health, LLC.  *Id.*

Sadej testifies that Floss Bar perceived Perry himself, and his expertise in the field, to be the "primary asset" of this transaction.  *Id.* ¶ 11.  For this reason, she states, Floss Bar paid for most of the acquisition of Onsite in stock.  *Id.* ¶ 10.  After the transaction, in addition to his position as President and Board Member of Floss Bar, Perry retained his positions as the owner,

---

[1] The parties have not squarely defined "mobile dental care," but the record suggests that Floss Bar contracts with private companies such as employers to bring dental services to those clients' locations.

[2] The parties agree that Perry was hired as part of Floss Bar's acquisition of Onsite.  *See* Doc. 39-2 at ¶ 8; Doc. 38, Second Perry Decl., at ¶ 6.

President, and Board Member of Xsite Health Limited, and as the President and Board Member of Floss Bar's new subsidiary, Xsite Health, LLC.  *Id.* ¶ 8.

### B.      The Non-Competition and Heads of Terms Agreements

On April 22, 2019, Perry and Sadej also executed several documents relating to Perry's employment as President of Floss Bar.   Perry declares that "negotiations about legal language" surrounding the merger and his hire were conducted on his behalf by his attorney in Copenhagen, while Perry was in Amsterdam.  Doc. 38 ¶ 7.  Sadej signed these documents in New York on behalf of Floss Bar.  Doc. 39-2 ¶ 11.  An email from Perry dated April 28, 2019 includes a travel calendar indicating that he was in Atlanta, Georgia on April 22, 2019, the date these documents were signed.  Doc. 39-9 at 2.

Most relevant to this motion is the Non-Competition and Non-Solicitation Agreement (the "Agreement"), which states that it was made "in consideration of the employment or continued employment of [Perry] by the Company."  Doc. 39-6.  The Agreement prohibits Perry from "engag[ing] or assist[ing] others in engaging in any business or enterprise . . . that is competitive with the Company's business" while he is employed by Floss Bar and "for a period of two years after the termination or cessation of such employment for any reason."   *Id.* at 1.  It also includes non-solicitation clauses prohibiting Perry from taking away business from actual or prospective clients of Floss Bar, and from recruiting away Floss Bar employees.  *Id.*  Finally, the Agreement contains another termination clause, stating that it will terminate upon the earlier of "(i) the third . . . anniversary of the date of this agreement and (ii) such time that the Employee's employment is terminated by the Company without Cause."  *Id.* at 2.

Perry also signed a "Heads of Terms" agreement, a bare-bones employment agreement. *See* Doc. 39-8.  The Heads of Terms Agreement includes a provision providing that "[t]he

Parties shall work together expeditiously and in good faith to enter into a full employment agreement as soon as reasonably practicable following the signing of the Merger Agreement, using these Heads of Terms as the basis for the agreement." *Id* at 2.  It also states that any "material changes to the terms and conditions of employment for [Perry] shall be made by the Board of Director[s] of Flossbar." *Id.* at 1.  Finally, while it did not explicitly mention the alleged promise to grant Perry stock options for 3% equity interest, it did include the following provision regarding stock options:  "The Employee shall have the right to participate in a plan for stock options for senior employees.  The exact terms and conditions of this, will be decided as part of the overall stock option.  The Board of Directors shall collectively and transparently design, vote, and approve said stock option plan for all other C-Level individuals." *Id.* at 2.

Perry alleges that the full employment agreement referenced in this Heads of Terms agreement never materialized, despite his requests made to Sadej to memorialize a more formal agreement.  Doc. 33-4, First Perry Decl., at ¶ 13.  Sadej claims that it was Perry who refused to discuss an employment agreement.  Doc. 39-2 ¶ 28.  Perry also alleges that Floss Bar never followed up on his multiple requests to receive paperwork regarding the stock options.  Compl. ¶ 18.[3]

### C.    The Competing Allegations of Misconduct and Perry's Placement on Leave

The professional partnership between Perry and Sadej soured within a few months of Perry's appointment as Floss Bar president.  Perry states that throughout 2019 he raised numerous concerns to Sadej and other Board members about rampant lawbreaking and other

---

[3] In addition to these forms, Perry also signed an "Invention and Non-Disclosure Agreement" in connection with his hire, which includes provisions requiring him to keep proprietary information confidential, and designating inventions created during the course of his employment as works made for hire under the Copyright laws.  *See* Doc. 39-7.

management issues at Floss Bar.  33-4 at ¶ 15.  For example, Perry states that in July 2019 he emailed a Floss Bar Board member a report raising several alleged issues at Floss Bar, including that:  (1) Floss Bar was misclassifying employees as independent contractors; (2) taxes were not paid quarterly and money was withheld but not reported to the government; (3) paid sick leave and/or short term disability was not being provided; (4) employees were performing dental procedures without proper licenses; and (5) that Floss Bar was not registered to operate in states in which there were employees.  *See id.* ¶ 20; Doc. 33-10.  Perry told Sadej that he agreed with these complaints.  Doc. 33-4 ¶ 20.  Perry states that he also raised or forwarded additional complaints throughout September and October 2019 regarding, among other issues, Floss Bar's irregular billing practices and lack of proper mobile dental permits.  *Id.* at ¶¶ 18-19; Docs. 33-8–9.[4]

Sadej also alleges misconduct against Perry.  She states that Perry violated Floss Bar policy by refusing to sign several employment documents, including the company's credit card policy.  Doc. 39-2 ¶ 28.  She also states that he did not use company-approved technology and improperly used employees as secretarial support.  *Id.* ¶¶ 29–30.  Sadej also alleges that, following the merger, Floss Bar discovered issues with its new subsidiary Xsite Health, LLC. She claims that Perry misrepresented the company's liabilities before the merger, and that it also failed to lawfully classify employees.  *Id.* at ¶¶ 24–25.  She notes that Xsite Health, Limited,

---

[4] Perry also alleges that defendant Sadej attempted to induce an employee to make false allegations of rape against an unidentified man, Compl. at ¶ 58; that Floss Bar discriminated against Black employees, and against Black dentists by not awarding them business, *id.* at ¶¶ 71-72; that Sadej and defendant Allan created a sexually hostile work environment by being partially undressed at the office (which doubled for a time as their apartment), having sex toys in the office, and forcing employees to have meetings alone in Allan's bedroom, *id.* at ¶ 74; and that Sadej and Allan used cocaine in the office.  *Id.* ¶ 135.

which was formed under the laws of Ireland, was struck from Ireland's Companies Registration Office in July 2019.  *Id.* at ¶ 4.[5]

On October 4, 2019, Floss Bar's shareholders voted to remove Perry as a Board member. *Id.* ¶ 31.[6]  The record does not disclose the Board's stated reason for this removal.  On October 29, 2019, Perry sent a letter in his capacity as director of Xsite Health, Limited (the parent company that is a shareholder of Floss Bar), alleging several material breaches of the parties' Merger Agreement.[7]  These included allegations that Floss Bar had not declared significant sums paid to Sadej and Allan or amounts accrued in legal fees, and had failed to settle certain "accounts payable of Xsite Health LLC . . . which Floss Bar represented it would promptly settle."  Doc. 39-19 at 2.  Sadej states that this letter included confidential information that Perry learned by virtue of his former position on Floss Bar's Board of Directors.  Doc. 39-2 ¶ 32. Floss Bar alleges that this was a breach of Perry's fiduciary duty to Floss Bar.  Doc. 39, Defs' Br., at 24.

On November 26, 2019, Floss Bar's Board of Directors passed a resolution authorizing Sadej to place Perry on paid leave through December 31, 2019.  Doc. 39-20, Action of Directors. The resolution authorized Sadej to negotiate a settlement agreement with Perry, but provided that "the final terms of any such settlement shall be subject to Board review and approval."  *Id.*  Perry

---

[5] Sadej also alleges that Floss Bar loaned Perry $300,000 in May 2019.  Doc. 39-2 ¶ 14.  She alleges that, in connection with the loan, Perry signed a promissory note and security agreement, on which he has since defaulted. *Id.* ¶¶ 14, 19.  The parties are in active litigation surrounding this debt in New York County Supreme Court.  *See* Doc. 32-1.

[6] This was the same day that Perry sent an email to members of Floss Bar's Board raising several compliance issues. Doc. 33-9.

[7] The document is dated October 22, 2019, but Sadej states, and Perry has not disputed, that it was sent to the Floss Bar Board of Directors on October 29, 2019.  Doc. 39-2 ¶ 32.

states that in December 2019, Sadej told him he would be on *unpaid* suspension beginning

January 1, 2020.  Doc. 33-4 ¶ 1.[8]  Since then, Perry has not been paid by Floss Bar.  *Id.*

The parties contest the current status of Perry's employment with Floss Bar.  While Perry

has not received any notice that he has been terminated by Floss Bar, he has also not been paid

for over a year.  *Id.*  However, Sadej states that Floss Bar has continued to pay for Perry's health

insurance benefits while on leave.  Doc. 39-2 ¶ 37; *see also* Doc. 39-21, Screenshot of Health

Benefits.  Perry has not disputed this.  Further, while Perry states that he has requested to be

released from his non-compete obligations, he also notes that he "did not make this request as

part of any settlement negotiation."  Doc. 33-4 ¶ 2.  The parties do not otherwise state that Perry

has voluntarily resigned his employment at Floss Bar, nor do they state that they have otherwise

reached a settlement agreement.

**D.      Circumstances Since 2020**

Since Perry was notified of his unpaid leave, he has sought new work in the mobile

dental industry.  Doc. 33-4 ¶ 5.  However, Perry states that the non-compete agreement has

presented an intolerable risk for potential business partners, and has prevented him from

pursuing other work in the field, at least in the United States.  ¶¶ 6–10.  As of December 21,

2020, Perry had not performed work for Floss Bar in 2020.  Doc. 38 ¶ 8.  At oral argument in the

Northern District of California in January 2021, Perry's counsel stated that Perry has been living

abroad since April 2020.  Doc. 44 at 9.

The record reveals little information regarding the extent to which Floss Bar continues to

provide mobile dental services.  Perry has submitted a declaration from a former employee

stating that, as of April 2020, Floss Bar had lost or was in the process of losing several of its

---

[8] Sadej states that the leave became unpaid on January 15, 2020.  Doc. 39-2 ¶ 36.

biggest clients.  Doc. 33-1, Cheryl Phillips Decl. ¶ 7.  Sadej states that Floss Bar "continues to service its customers as needed" and that it "continues to market Floss Bar's services and solicit new business."  Doc. 39-2 ¶ 41.

     **E.**    **Procedural History**

On July 13, 2020, Perry first filed this action in San Francisco Superior Court.  Doc. 1-1. Defendants removed the case to the Northern District of California on August 12, 2020.  Doc. 1. On December 4, 2020, Defendants moved to change venue to this District.  Doc. 31.  The next day, Perry made the instant motion for a preliminary injunction to prohibit Defendants from enforcing the non-compete agreement.  Doc. 33.  On January 22, 2021, following oral argument, the Honorable Susan Illston transferred this case to this District.  Doc. 44.  Without reaching the merits, Judge Illston denied the preliminary injunction motion without prejudice for Perry to renew it here.  On February 19, 2021, this Court held an initial pretrial conference at which Plaintiff requested to renew the motion.

**II.**    **Legal Standard**

To obtain a preliminary injunction in this Circuit, a plaintiff must establish irreparable harm and meet either of two standards: "(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor."  *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 348 (S.D.N.Y. 2020) (citations omitted).  When—as here—a plaintiff seeks to alter, rather than maintain, the status quo, he must establish a "clear" or "substantial" likelihood of success on the merits.  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).

### III.     Likelihood of Success on the Merits

Perry raises four arguments as to why the non-compete should not be enforced.  Doc. 33, Perry Br., at 6–7.  First, he argues that he has been terminated from Floss Bar without cause, and thus the Agreement has terminated according to its own terms.  Second, he argues that the contract is void under Cal. Bus. & Prof. Code § 16600, which prohibits non-competition agreements.  Third, he argues that the agreement is voidable because he was fraudulently induced to sign it.  Fourth, he argues that the scope, geographic extent and duration of the agreement is unconscionably broad.  Before addressing these arguments, the Court must first determine what law governs the agreement.

### A.     Construction of the Agreement's Choice of Law Provision

Because this case was transferred from the Northern District of California, the Court would ordinarily apply California law to the construction of the Agreement.  *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (after a transfer of venue pursuant to 28 U.S.C. § 1404, the transferee court is obligated to apply the substantive law of the state in which transferor court sits).  However, the Agreement included a choice of law provision, stating that it would be "governed by and construed in accordance with the laws of the State of Delaware (without reference to the conflicts of laws provisions thereof)."  Doc. 39-6 at 3.  Thus, the Court must first apply California law to determine whether this choice of law provision is valid.

### i.     California Labor Code § 925

The Court first addresses relevant California statutory law.  California Lab. Code § 925 generally renders forum selection and choice of law provisions unenforceable in employment contracts, provided that an employee "primarily resides and works in California" and agrees to such provision "as a condition of employment."  Perry argues that California law applies because

he was a resident and citizen of California throughout his employment with Floss Bar.  Doc. 42, Perry Reply Br. at 4.  Floss Bar argues that the Agreement falls under the exception set forth in § 925(e), which provides that the general prohibition on such choice of law clauses "shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement . . . ."  Floss Bar also argues that Perry was a Georgia resident throughout his employment, and has primarily lived and worked outside of California, thus rendering § 925 inapplicable.  Defs' Br. at 19–20.

On the available evidence, Perry is not likely to show that the Delaware choice of law provision is void.  As to Floss Bar's first argument, the available evidence shows that Perry was likely represented by counsel in negotiating the Agreement.  Floss Bar cites to Perry's statement—made in reference to "negotiations about the merger or becoming President of the resulting company"—that "[n]egotiations about legal language and such was conducted on my behalf by a lawyer in Copenhagen."  Doc. 38 ¶ 7.  This statement suggests that Perry's counsel participated in negotiating the Agreement, which purports to be made "in consideration of the employment or continued employment of the Employee."  Doc. 39-6 at 1.  Indeed, Perry has not argued otherwise.  The Court acknowledges that elsewhere in the record Perry has stated that Floss Bar "required that I sign" the Agreement, which could be interpreted to suggest that the Agreement was executed separately from the documents his counsel helped negotiate.  Doc. 33-4 at ¶ 14.  But the weight of available evidence—combined with Perry's failure to contest Defendants' argument that he was represented—suggests that counsel was indeed involved in negotiating the Agreement and that the § 925(e) exception applies.

However, even if Perry was *not* represented by counsel in negotiating the terms of the Agreement itself, he has not shown that he "primarily resided and worked in California" so as to

fall under the ambit of § 925.[9]  Judge Illston's Opinion noted that Perry's 2019 calendar showed

34 days spent in San Francisco, and the Court has also identified between one and three days

spent in Los Angeles based on this calendar.  *See* Doc. 44 at 8; Doc. 38, Ex. 1 at 22–23.  This is

an insufficient basis on which to find that the Perry primarily *worked* for Floss Bar in California

under § 925.  Rather, § 925 requires a showing that the employee's work itself occurred

primarily in California.  *See Bromlow v. D & M Carriers, LLC*, 438 F. Supp. 3d 1021, 1030

(N.D. Cal. 2020) (finding that a California resident who performed approximately 20% of his

work in California did not primarily work in California and thus could not rely on § 925); *see*

*also Campbell v. FAF, Inc.*, No. 19 Civ. 142 (WQH)(BLM), 2019 WL 2574119, at *5–6 (S.D.

Cal. June 20, 2019) (finding that Plaintiff, a truck driver, did not primarily work in California

when approximately 12% of his documented miles driven were done as part of deliveries to or

from California).

Thus, § 925 is not likely to bar the Court's enforcement of the choice-of-law provision.

However, the Court still must apply California's common law test under the Restatement

(Second) Conflict of Laws ("Rest.") to assess whether the choice-of-law provision is otherwise

unenforceable.

### ii.      Restatement (Second) Conflict of Laws Test

As delineated in *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992), California

uses the Restatement (Second) Conflict of Laws test to analyze whether a contractual choice of

law clause is enforceable.  Under this test, the Court must determine "(1) whether the chosen

---

[9] In connection with Floss Bar's prior venue transfer motion, the parties have vigorously contested whether Perry was a Georgia or California resident during his active employment with Floss Bar.  This dispute is set forth in more detail in Judge Illston's January 22 Opinion.  *See* Doc. 44 at 9 (declining to place significant weight on Perry's choice of forum and finding that he "traveled extensively and spent some time in San Francisco and most of the time elsewhere, and that he traveled to New York, Georgia, and overseas.").

state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines*, 3 Cal. 4th at 466.   If either of these tests is met, the court must move to the next step, and determine whether the chosen state's law is "contrary to a *fundamental* policy of [the default state under Rest. § 188].").   *Id.* (emphasis in original).  If there is no conflict between the fundamental policies of the chosen state and the default state, the choice-of-law provision will be respected.

Because Floss Bar is a Delaware corporation, Delaware has a "substantial relationship" to the parties and their transaction under California law.  *See Nedlloyd Lines B.V.*, 3 Cal. 4th at 467 (finding that certain parties' incorporation in the chosen jurisdiction provided the requisite substantial relationship) (internal quotation marks omitted).  Thus, the Court must determine whether application of Delaware law would conflict with a fundamental policy of the default state.  The "default" state refers to the "state of the applicable law in the absence of an effective choice of law by the parties."  Rest. § 187.[10]  To assess which state is the default state, the Court must examine "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."  Rest. § 188.  If there is no such conflict, the court shall enforce the parties' choice of law.

---

[10] In *Nedlloyd* itself, the court simply referred to "California" rather than the "default state"; however, the court noted that there may be cases brought in California in which "California is the forum, and the parties have chosen the law of another state, but the law of yet a third state, rather than California's, would apply absent the parties' choice.  In that situation, a California court will look to the fundamental policy of the third state in determining whether to enforce the parties' choice of law."  *Id.* at n.5.  This case presents that unusual situation, with the additional wrinkles that this case was first removed from state court, and then transferred to New York since being brought in California.

Here, Defendants are likely to show that the default state is New York.[11]  Sadej signed

the Agreement while in New York, while Perry's calendar indicates that he likely signed it in

Georgia.  Doc. 32-9 ¶ 7; Doc. 39-9 at 2.  There is evidence suggesting that parts of the merger

and hire negotiations occurred in both San Francisco and New York.  *Compare* Doc. 39-2 at ¶ 13

(stating that much of these negotiations occurred in New York); *with* Doc. 38 at ¶¶ 3, 6 (stating

that agreement about key parts of the merger and hire occurred in San Francisco).  However,

Perry also states that the "legal language" of relevant materials was negotiated by his lawyer in

Copenhagen.  Doc. 38 at ¶ 7.  Thus, these first two factors weigh in favor of New York, but only

slightly.  The same is true of the place of performance.  Plaintiff has submitted the lease for his

San Francisco apartment, which was both his permanent residence and office space throughout

2019.  Doc. 38, Ex. 2 at 67.[12]  However, Plaintiff's job duties appeared to involve constant travel,

and Plaintiff has stated that he was "away from my home in San Francisco more than I was at

home in San Francisco."  Doc. 38 ¶ 9.  Given that New York was the location of Floss Bar's

headquarters and a frequent travel destination for Perry, this factor is largely neutral.

Finally, Perry has argued that California law governs the Agreement because he "was a

resident and citizen of California throughout his employment with Floss Bar."  Doc. 42 at 4.

However, in her decision granting Defendants' motion to change venue, Judge Illston declined to

put significant weight on Perry's San Francisco residence, noting that he "traveled extensively

and spent some time in San Francisco and most of the time elsewhere, and that he traveled to

New York Georgia, and overseas."  Doc. 44 at 9.  Judge Illston emphasized that residence refers

---

[11] While the parties have not squarely addressed this issue in the context of this Restatement analysis, the Court finds that the parties' submissions regarding the appropriate venue for this action sufficiently set forth facts relevant to this question, including extensive evidence regarding Perry's residence, travel schedule and other facts relevant to the location of contracting and performance.

[12] This location was zoned as "live/work," which Perry states permits both residential and domestic use.  Doc. 38 at ¶¶ 1, 14.  Floss Bar paid rent on the apartment for three months.  *Id.* at ¶ 15.

to a party's physical location, rather than their citizenship or domicile, which encompass both physical location and an intent to make a place one's permanent abode.  *Id.* at 8.  Moreover, it is uncontested that, during this time, Defendants Sadej and Allan were residents of New York.  *Id.* at 11.  Thus, while the Court acknowledges that Perry was at least domiciled in California during this period, this does not outweigh the countervailing factors of Defendants' residence and connection to New York, or the fact that the other § 188 factors are either neutral or weigh in favor of New York.

The Court now must assess whether application of Delaware law would conflict with a fundamental public policy of New York.  The Court finds that it would not.  New York and Delaware both adhere to similar common law standards of reasonableness in analyzing non-compete agreements.  *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999);  *All Pro Maids, Inc. v. Layton*, No. Civ.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004). These tests require balancing factors such as whether the agreements reasonably advance a legitimate economic interest of the party seeking enforcement, and whether they are otherwise unequitable.

Thus, after applying California's test for assessing whether to apply the Delaware choice-of-law provision, the Court finds that Perry has not shown that California law is likely to govern the Agreement.  Rather, Delaware law will likely apply, pursuant to the Agreement's choice-of-law provision.

### B.    Perry Has Not Met His Burden to Show that He Has Been Terminated

Perry argues that, because he was terminated by Floss Bar without "cause" as defined in the Agreement, it is no longer enforceable by its own terms.[13]  Floss Bar states that Perry is

---

[13] The agreement provides that it shall terminate upon the earlier of "(i) the third . . . anniversary of the date of this Agreement, and (ii) such time that Employee's employment is terminated by the Company without Cause."  It

currently on a leave of absence, but remains a Floss Bar employee.  In support, it submits

evidence showing that, as of December 2020, Perry was still receiving paid healthcare benefits

from Floss Bar, and was still listed as President on Floss Bar's webpage.  Docs. 39-21, 39-22.

Alternatively, Floss Bar argues Perry has engaged in conduct that would merit termination for

cause.  It is unnecessary to examine whether Perry's conduct would merit termination for cause,

because he has not met his burden to show that he has been terminated.

   Perry and Floss Bar agree that Perry has not been informed that he has been terminated.

*See* Doc. 33-4 ¶ 1, Defs' Br. at 15.  Perry states, however, that he was last "actively working" for

Floss Bar in November 2019, and last paid in January 2020.  Doc. 33-4, ¶ 1, Doc. 38 at ¶ 8.

Perry argues that this leave is effectively a termination.  Perry Br. at 5.  He also submits

declarations from ex-Floss Bar employees stating that Sadej has stated to employees and clients

that Perry is "no longer with Floss Bar," or "no longer working with Floss Bar."  Docs. 33-1 ¶ 5,

33-3 ¶ 5.[14]  Cheryl Phillips, a former employee, also notes that she was told to stop copying

Perry on emails around January 2020.  Doc. 33-1 at ¶ 3.

   However, such statements to third parties are not enough to counteract the more relevant

facts that Perry himself has not been told that his employment has been terminated, and that he—

at least as of December 22, 2020—was receiving Floss Bar health benefits.  Nor has the Floss

Bar Board of Directors voted to terminate Perry's employment, which Sadej states is necessary

---

continues to define "Cause" to include grounds such as "(i) the Employee engages in embezzlement, misappropriation of funds in bad faith … ; (ii) willful conduct by the Employee which is demonstrably and materially detrimental to the business, operations or reputation of the Company…[or] the Employee's willful misconduct or willful refusal to comply with written company policies and procedures . . ."  Doc. 39-6.

[14] While Defendants have argued that these statements are hearsay, the Court may consider hearsay at the preliminary injunction stage.  *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).  However, the Court can, and will, put limited weight on these statements because they are hearsay.

under its By-Laws.[15]  Defs' Br. at 23.  The Court acknowledges that this is an inordinately long time to be on unpaid leave, and that these circumstances are unusual.  However, Perry has not provided authority—and the Court is not aware of any—showing that this passage of time is sufficient to constitute a "termination" under Delaware law.  Thus, the Court cannot find on this record that an unpaid leave, even a prolonged one such as this, is enough to cease the enforcement of the Agreement without some additional action from one of the parties to end the employment relationship.

Perry also raises arguments that suggest that he has been constructively discharged.  *See* Doc. 33 at 5 ("Floss Bar effectively discharged Joshua Perry . . ."); *see also* Doc. 42 at 2 ("More than a year has passed since Floss Bar ostensibly 'suspended' Mr. Perry, and Floss Bar concedes no limit to how long it can keep Mr. Perry suspended without pay.").  Under the constructive discharge doctrine, "an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."  *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).  The doctrine is available under Delaware law.  *See Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 831 (Del. 2005).  To establish such a constructive discharge, the plaintiff must show "working conditions so intolerable that a reasonable person would have felt compelled to resign."  *Id.* at 832 (citation and quotation marks omitted).

Here, however, Perry has not shown that this doctrine is available because he has not shown that he has resigned in fact.  *Id.* at 831 (noting that the doctrine is available in the case of an employee "who *voluntarily resigns* rather than being terminated." (emphasis added)).  While

---

[15] Similarly, the Board action initially placing Perry on unpaid leave requires the terms of any settlement agreement to be approved by the Board.  *See* Doc. 39-20.

Perry states that he has asked Floss Bar to release him from his non-compete agreement, he has also stated that he "did not make this request as part of any settlement negotiation."  Doc. 33-4 at ¶ 2.  Nor does he otherwise state that he resigned, and the record does not show the existence of any settlement agreement.  Moreover, the evidence that Perry was still receiving health insurance benefits from Floss Bar as of December 2020 further undermines this argument.  *See* Doc. 39-21. Absent evidence of actual resignation, Perry cannot avail himself of the constructive discharge doctrine.[16]

### C.    Perry Has Not Met His Burden to Show that the Agreement was Induced by Fraud

Perry argues that the contract is voidable because it was induced by fraud.  This appears to be a reference to the Complaint's First Cause of Action, in which Perry alleges that Defendants made several material misrepresentations in the process of recruiting him and negotiating the merger and hire.  These include allegations that:  (1) Defendants had no intent to perform their promise to grant Perry stock options for 3% equity; (2) Defendants had no intent to continue to pay Perry $200,000 per year; (3) Defendants had no intent for Perry to contribute generally to key decisions in relation to the business; and (4) Defendants had no intent to comply with applicable laws.  Compl. ¶¶ 18–24.

To establish a likelihood of success on the merits of his fraudulent inducement claim regarding the Agreement, Perry must proffer evidence showing "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance

---

[16] The Court does not express an opinion on whether Perry would be able to establish constructive discharge if there were evidence that he has resigned.

upon the representation; and 5) damage to the plaintiff as a result of such reliance." *Loud v. Souder*, 748 A.2d 393, 402 (Del. 2000).

Here, Perry may certainly pursue discovery on these allegations to prove his case. However, he has not supported the allegations with additional facts or legal arguments in this motion, with the possible exception of a declaration from former Floss Bar employee Farhad Attaie. *See* Doc. 33-2.  Attaie states that Sadej and Stuart Allan had spoken openly about their desire to seize control of Xsite Health from Perry, and to more generally force him out of Floss Bar.  Doc. 33-2 at ¶¶ 2–5.  However, this Declaration is not sufficient, without more, to show a likelihood of success on the merits of each element of the fraudulent inducement claim.  For example, it does not identify a specific misrepresentation made by Defendants to Perry regarding the Agreement.  This does not mean Perry's allegations here are doomed to fail.  It only means that, on this limited record, the Court cannot find that Perry is likely to succeed on the merits of such a fact-dependent claim.

### D. Perry Has Not Met His Burden to Show that the Agreement is Otherwise Unenforceable Under Delaware Law

In addition to the arguments raised in Sections III.B–C, *supra*, Perry also argues that the agreement is void under Cal. Bus. & Prof. Code § 16600.  However, as described in Section III.A, Perry has failed to show that California law applies to the construction of the Agreement.  Thus, the Court cannot void the agreement on this basis.

Perry also argues that even if the agreement is not enforceable on any of the bases described above, it should be invalidated because the "scope, geographic extent, and duration of the agreement are unconscionably overbroad."  Doc. 33 at 7.[17]  In assessing whether the

---

[17] To the extent that Perry's Complaint has alleged additional grounds on which the Agreement is unenforceable that were not explicitly raised in the preliminary injunction briefing, the Court expresses no opinion on these arguments.

agreement is overbroad on any of these bases, the Court is to remain mindful of whether the agreement actually advances a legitimate economic interest of the employer, or if this interest is "ephemeral in contrast to the grave harm to the employee."  *See Del. Exp. Shuttle, Inc. v. Older*, No. Civ.A. 19596, 2002 WL 31458243 (Del. Ch. Oct. 23, 2002), at *11.  However, Perry has not established that any of these aspects of the agreement are likely to violate Delaware law.

First, Delaware courts have upheld language of similar scope to the Agreement, which prohibits Perry, during the specified time and "in the geographic areas in which Floss Bar does business or has done business at the time of [Perry's] termination," from "engag[ing] or assist[ing] others in engaging in any business or enterprise . . . that is competitive with the Company's business . . ."  Doc. 39-6 at 1.  For example, in *Norton Petroleum Corp. v. Cameron*, while the Court of Chancery struck down restrictions on working for companies "similar to" the company, it permitted an agreement enjoining the defendant from *competing with* the company.  No. Civ.A 15212-NC, 1998 WL 118198, at *3–5 (Del. Ch. Mar. 5, 1998); *see also Del. Exp. Shuttle, Inc.*, 2002 WL 31458243, at *13 (same).  Thus, the description of Perry's prohibited activity is not overbroad.

Similarly, Delaware courts have generally found agreements of a two-year duration to be enforceable against individuals who were "key employee[s]."  *See Del. Exp. Shuttle, Inc.*, 2002 WL 31458243, at *14; *see also EDIX Media Grp., Inc v. Mahini*, No. Civ.A. 2186-N, 2006 WL 3742595, at *7 (Del. Ch. Dec. 12, 2006).[18]  While Delaware courts have, on occasion, found that such a period is too long, this has generally occurred in cases dealing with lower-level workers

---

[18] The Court acknowledges that the Agreement also includes a second provision that is potentially in conflict with the two-year duration provision.  This provision states that the Agreement will terminate upon the earlier of the third anniversary of agreement's execution date, or upon Perry's termination in the event he is terminated without cause. *See* Doc. 39-6 at 1, 2.  However, if this second provision is found to govern, it would result in a shorter total period of restricted activity than would application of the two-year period analyzed above.  Thus, either provision is likely to be enforceable.

whose competition or skills would pose little meaningful threat to the company. *See, e.g.*, *Elite Cleaning Co., Inc. v. Capel*, No. Civ.A. 690-N, 2006 WL 1565161, at *8-9 (Del. Ch. June 2, 2006) (invalidating non-compete agreement for janitor who had no confidential knowledge, no special skills or training, and was not highly compensated). Here, Perry's experience in the mobile dental field suggests that a two-year restriction would not be unreasonable under Delaware law, given that he would have ample skills to compete with Floss Bar.[19]

Finally, the Agreement is limited to a restriction on competition "in the geographical areas that the Company does business, or has done business at the time of [Perry's] termination." Doc. 39-6. This formulation presents a bit of an interpretive challenge. Non-compete agreements are generally reasonable under Delaware law if they are restricted to geographic areas in which they will serve a legitimate economic interest of the company. *See Norton Petroleum Corp.*, 1998 WL 118198, at *4 (noting that an agreement's geographic scope "must also be defined consistently with Norton's legitimate business interests"). This condition is generally met when the agreement is limited to the areas in which the Company operates. *See, e.g.*, *EDIX Media Grp., Inc.*, 2006 WL 3742595, at *7 (upholding an agreement that "limits its scope to plaintiff's primary operating areas."). However, Delaware courts have, on occasion, imposed reasonable geographical restrictions where none existed whatsoever, or modified existing restrictions to prevent undue hardship to individuals. *See, e.g., Norton Petroleum Corp.*,

---

[19] However, the Court agrees with Perry that Floss Bar goes too far in its insinuation that he is likely to divulge proprietary information in violation of his Inventions and Non-Disclosure Agreement. *See* Doc. 42 at 8. Perry's statement of desire to use his "personal network, strategic partnerships, business relationships, and know-how of delivery" merely describes the qualities that may make him attractive to prospective employers. *Id.*

1998 WL 118198, at *4 (narrowing the geographic scope of an agreement); *see also Del. Exp. Shuttle, Inc.*, 2002 WL 31458243, at *13 (same).[20]

Here, however, Perry has not made an argument or submitted evidence regarding what a more appropriate geographic area would be, or how this agreement should otherwise be circumscribed to protect only Floss Bar's legitimate economic interests without undue hardship to Perry.  He does submit a declaration from a former Floss Bar employee, noting that Floss Bar's business has suffered during the COVID pandemic, and it lost or was losing several major clients as of April 2020.  Doc. 33-1 at ¶ 7.  He also points to Sadej's pivot into other business ventures to argue that Floss Bar has a limited interest in enforcing the Agreement against him.  For her part, Sadej does not directly dispute that Floss Bar has lost clients or business, but claims that it "continues to service its customers as needed" and "continues to market Floss Bar's services and solicit new business."  Doc. 39-2 at ¶ 41.  She also states that Floss Bar "generates the most business in the Northeast, Atlanta, and Chicago," but that it only conducted business in California through the Xsite Health LLC subsidiary, under the Floss Bar brand.  Doc. 39-2 at ¶ 45.

This evidence does not foreclose the possibility that there are geographic areas in which Floss Bar "does business," but nevertheless has such a weak economic interest relative to Perry that the Agreement cannot be upheld in such areas.  For example, in *Norton Petroleum Corp.*, the court restricted the scope of an agreement to a 20-mile radius instead of a 100-mile radius upon a finding that a company's customers outside of that 20-mile radius were few in number, widely dispersed, and generally unprofitable for the company to do business with.  1998 WL 118198, at

---

[20] However, the failure to include an express geographic scope does not render the Agreement unenforceable per se. *See Del. Exp. Shuttle, Inc.*, 2002 WL 31458243, at *12 (quoting *Gas Oil Prods., Inc. of Del. v. Kabino*, 1987 WL 18432, at *2 (Del. Ch. Oct. 13, 1987)).

*4.  However, it is Perry's burden to make his case on this point, and at this juncture it is not clear where those areas would be.  Thus, on this unusual and limited record, the Court finds that Perry has not shown that he is likely to succeed on the merits of his claim that the geographic scope of the agreement is void as written.

## IV.    Irreparable Harm

Because Perry has failed to establish a likelihood of success on the merits of his claim, there is no need to determine whether Perry has demonstrated that irreparable harm would result in the absence of an injunction.  *See N. Am. Soccer League, LLC v. United States Soccer Fed'n., Inc.*, 883 F.3d 32, 45 (2d Cir. 2018) (declining to consider other preliminary injunction factors when movant failed to demonstrate a substantial likelihood of success in a mandatory injunction case); *see also Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 355 (S.D.N.Y. 2020) (same).

## V.    Conclusion

For the foregoing reasons, Perry's motion for a preliminary injunction is DENIED.  The Clerk of Court is respectfully directed to terminate docket number 33.


It is SO ORDERED.

Dated:    March 8, 2021
          New York, New York

_____
                 EDGARDO RAMOS, U.S.D.J.